# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Central Pennsylvania Radiation Oncology, P.C., a Pennsylvania corporation, | : : : | |
| Appellant | : : | |
| v. | : : : | No. 1004 C.D. 2020 SUBMITTED: September 20, 2021 |
| The Good Samaritan Hospital of Lebanon, Pennsylvania, a Pennsylvania Corporation, WellSpan Health, a Pennsylvania Corporation, and Robert Longo, an adult Individual | : : : : : : | |

BEFORE:  HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                    **FILED:  December 15, 2021**

Central Pennsylvania Radiation Oncology, P.C. (Central), appeals from an order of the Court of Common Pleas of Lebanon County granting the motion for summary judgment filed by Good Samaritan Hospital of Lebanon, Wellspan Health, and Robert Longo (collectively, Appellees) and dismissing, with prejudice, Central's second amended complaint.  In addition, the trial court dismissed, with prejudice, the second amended counterclaim filed by Appellees.[1]  However, both

---

[1] The Superior Court transferred this appeal to Commonwealth Court pursuant to the following:

> [Commonwealth Court's] exclusive jurisdiction of appeals from
> final orders of the courts of common pleas in . . . [a]ll actions or

**(Footnote continued on next page…)**

parties agree that Appellees' counterclaim was withdrawn. We conclude that the issues presented to this Court have been thoroughly reviewed and correctly analyzed in the opinion of the Honorable Charles T. Jones, Jr. Accordingly, mindful that there is no longer an operative counterclaim, we affirm based on Judge Jones' opinion captioned *Central Pennsylvania Radiation Oncology, P.C. v. The Good Samaritan Hospital of Lebanon*, *Pennsylvania*, (No. 2015-02124, Lebanon County C.P. Pa. filed January 30, 2020).

By way of background, Good Samaritan Hospital officially became WellSpan Good Samaritan Hospital in 2015. Having formerly served as president of Good Samaritan Hospital, Robert Longo became senior vice president of WellSpan Health. Before Central's 2016 closure, Central provided radiation oncology therapy in Lebanon County. Now deceased, Dr. Abdurrahman Unal served as Central's medical director.

In 2007, Longo engaged consultants to help implement the goal of opening a new cancer center that would provide both medical and radiation oncology. Subsequently, Good Samaritan Hospital reached out to Central and met confidentially with Dr. Unal and several other area physicians. The intent of the people affiliated with Good Samaritan Hospital in arranging the meetings and what occurred during those meetings is disputed. In any event, in 2014, Good Samaritan Hospital announced the development of its new cancer center and in January 2016,

---

proceedings otherwise involving the corporate affairs of any corporation not-for-profit subject to Title 15 [of the Pennsylvania Consolidated Statutes (relating to corporations and unincorporated associations)] or the affairs of the members, security holders, directors, officers, or employees or agents thereof, as such.

Section 762(a)(5)(ii) of the Judicial Code, 42 Pa.C.S. § 762(a)(5)(ii).

2

the new Sechler Family Cancer Center opened. In August 2016, Central closed. The gravamen of Central's eight-count second amended complaint is that the two nonprofits, Good Samaritan Hospital and WellSpan Health, formed a partnership with Central and then subsequently breached their fiduciary duties. Much of Central's case is premised upon statements made by Dr. Unal, who died in June 2016 without ever having been deposed.

As Judge Jones ruled, the admissible evidentiary record contains insufficient facts to make out a prima facie case for any of the eight causes of action. Accordingly, with the clarification that there is no longer an operative counterclaim, we affirm based on the trial court's opinion.[2]

BONNIE BRIGANCE LEADBETTER,
President Judge Emerita

---

[2] In response to Judge McCullough's thoughtful dissent, it remains clear that Central cannot establish that Good Samaritan owed any duty to it without introducing out-of-court hearsay statements of Dr. Unal, which are clearly not admissible. In other words, without being able to establish *why* information was given to Good Samaritan, Central cannot show any obligation on the part of Good Samaritan to treat the information in any particular way.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Central Pennsylvania Radiation : 
Oncology, P.C., a Pennsylvania : 
corporation, : 
                  Appellant : 
  : 
            v. :   No. 1004 C.D. 2020
  : 
The Good Samaritan Hospital of : 
Lebanon, Pennsylvania, a Pennsylvania : 
Corporation, WellSpan Health, a : 
Pennsylvania Corporation, and Robert : 
Longo, an adult Individual : 

# O R D E R

AND NOW, this 15th day of December, 2021, the order of the Court of Common Pleas of Lebanon County is hereby AFFIRMED based on the attached opinion of the Honorable Charles T. Jones, Jr., captioned *Central Pennsylvania Radiation Oncology, P.C. v. The Good Samaritan Hospital of Lebanon*, *Pennsylvania*, (No. 2015-02124, Lebanon County C.P. Pa. filed January 30, 2020).

 

 

                         _____

                         **BONNIE BRIGANCE LEADBETTER,**
                         President Judge Emerita

IN THE COURT OF COMMON PLEAS
OF LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2020 JAN 30 A 8:52

## CIVIL DIVISION

CENTRAL PENNSYLVANIA
RADIATION ONCOLOGY, P.C.,
a Pennsylvania professional corporation,
Plaintiff/Counter-Defendant,

v.

THE GOOD SAMARITAN
HOSPITAL OF LEBANON,
PENNSYLVANIA, a Pennsylvania
Corporation, and WELLSPAN
HEALTH, a Pennsylvania corporation,
Defendants/Counter-Plaintiffs.

: Docket No.: 2015-02124

## ORDER OF COURT

AND NOW, to wit, this 29th day of January, 2020, after careful consideration of the record and the oral arguments set forth by the parties, Defendants' Motion for Summary Judgment is hereby **GRANTED**. The Complaint is Dismissed with Prejudice. In addition, Defendants' Second Amended Counterclaim is Dismissed with Prejudice.

BY THE COURT:

_____, J.
CHARLES T. JONES, JR.

cc:     Andrew J. Kennedy, Esquire
        Andrew J. Race, Esquire

CENTRAL PENNSYLVANIA
RADIATION ONCOLOGY, P.C.,
a Pennsylvania professional corporation,
Plaintiff/Counter-Defendant,

v.                                          : Docket No.: 2015-02124

THE GOOD SAMARITAN
HOSPITAL OF LEBANON,
PENNSYLVANIA, a Pennsylvania
Corporation, and WELLSPAN
HEALTH, a Pennsylvania corporation,
Defendants/Counter-Plaintiffs.

**APPEARANCES:**

Andrew J. Kennedy, Esquire          For Plaintiff/Counter-Defendant

Andrew J. Race, Esquire             For Defendants/Counter-Plaintiffs

**OPINION BY JONES, JR. J.:**

Before this Court is Defendant's Motion for Summary Judgment.

## I.    FACTUAL HISTORY

Plaintiff/Counter-Defendant Central Pennsylvania Radiation Oncology, P.C. a/k/a Lebanon Valley Cancer Center is a Pennsylvania professional corporation. Plaintiff alleges that for over twenty-five years it was the sole provider of radiation oncology therapy in Lebanon County, Pennsylvania. Dr. Abdurrahman Unal, M.D. was the Medical Director of Plaintiff and passed away shortly after litigation commenced. Plaintiff initiated this matter because it is Plaintiff's belief that

2

Defendants purposefully deceived Plaintiff for the purpose of learning confidential information from Plaintiff. Plaintiff claims that Defendants then used the confidential information to assist in destroying Plaintiff's business in Lebanon, Pennsylvania.

Defendants/Counter-Plaintiffs include The Good Samaritan Hospital of Lebanon, Pennsylvania, a Pennsylvania corporation, WellSpan Health, a Pennsylvania corporation, and Mr. Robert Longo, an adult individual. The Good Samaritan Hospital (hereinafter "GSH") entered into an affiliation with WellSpan Health in December of 2014 with GSH officially becoming part of WellSpan Health (hereinafter "WellSpan") on July 1, 2015. Defendant Robert Longo is the former President and CEO of GSH and former Senior Vice-President of WellSpan.

The issues in this case began in the early 2000's. For several years between 2000 and 2015, GSH suffered financial losses. During this time, Robert Longo (hereinafter "Longo") and GSH determined the hospital should open a new, comprehensive cancer center that would provide both medical oncology and radiation oncology. In 2007, at the direction of Longo, GSH engaged Oncology Resource Consultants, Inc. (hereinafter "ORC") to advise GSH in developing the new cancer center. A working group, headed by Longo, was established to accomplish the goal of providing radiation oncology therapy in the new cancer center. **Plaintiff Ex. 44.**

In the summer of 2007, GSH determined it would reach out to Plaintiff Lebanon Valley Cancer Center (hereinafter "LVCC") and meet confidentially with Dr. Unal along with several other physicians in the area. It is disputed what the intent of GSH was in arranging the meetings and what actually occurred at each meeting. Plaintiff claims GSH intended to work together to create a co-location with Plaintiff, unify radiation oncology in Lebanon, and hire Dr. Unal. Plaintiff argues that under the guise of the parties working together towards a joint cancer

3

center, GSH obtained detailed confidential information from Plaintiff including its revenue, costs, profits, operational techniques, and marketing techniques. **Plaintiff Ex. 27, 45.**

Plaintiff claims this information was partially obtained when ORC President, Nancy Bookbinder, met with Dr. Unal on the behalf of GSH. The meetings took place at GSH. Plaintiff argues Nancy Bookbinder ("hereinafter Bookbinder") informed Dr. Unal that she was advising GSH on developing a new cancer center with Plaintiff and asked Dr. Unal to provide confidential information to GSH. GSH argues the purpose of the meetings was to meet with local physicians to complete an analysis of local care. GSH denies any agreement to open a joint center or form any partnership or joint venture. **Plaintiff Ex. 27, 45.**

After meeting with Dr. Unal, the working group, Long, and ORC established a strategic plan for the creation of the new cancer center. This plan consisted of inviting Dr. Unal to the next working group session to discuss potential unifying efforts. The strategic plan also listed co-location of ambulatory oncology services in a community cancer center as a specific goal. In order to accomplish this specific goal, the strategic plan suggested that GSH meet with LVCC "to determine interest in any issues associated with potential co-location of radiation therapy services in a new ambulatory cancer center." **Plaintiff Ex. 29, P. 53.**

In September of 2012, ORC provided GSH with an analysis and prospects of the potential cancer center. The analysis included a projection that if LVCC remained in business, the new cancer center at GSH would only treat between twenty (20) and twenty-four (24) radiation oncology patients a day. ORC labeled this as the "worst case scenario." The probable and optimal case scenarios of the analysis included GSH performance if LVCC closed. Ultimately, ORC projected that if LVCC did not close, GSH medical oncology would lose approximately $2.8 million over a five-year period. If LVCC were to close, GSH would profit

4

approximately $8.9 million over a five-year period in the probable case and $11.9 million in the optimal case scenario. **Plaintiff Ex. 43, 44, 45.**

In 2013 or 2014, GSH employee Kelly Smith (hereinafter "Smith") met with Susan McCoy, Office Manager at LVCC. Plaintiff claims the purpose of this meeting was for Smith to be trained by Plaintiff on all aspects of providing radiation oncology therapy care, from patient intake through discharge and billing. Plaintiff states that during this meeting, Smith obtained confidential information including Plaintiff's operational efficiency, quality of assurance, strategic marketing plans, and confidential referral sources. Plaintiff argues Smith then used this information in developing the new cancer center at GSH. Plaintiff also claims that Susan McCoy (hereinafter "McCoy") was under the impression that a reciprocal meeting would occur at GSH. However, after reaching out to Smith three (3) times to arrange a cross training at GSH, Smith never scheduled a training with McCoy. **Plaintiff Ex. 46, 58.**

Around the time of the meeting/training, Dr. Unal instructed McCoy and LVCC employee Paul M. Castro, Ph.D. (hereinafter "Dr. Castro") to send Smith LVCC's 1st Quarter of 2014 Quality Assurance Report dated April of 2014. Plaintiff claims this information was sent with the belief that GSH and Plaintiff were working together. **Plaintiff Ex. 59.**

In the spring of 2014, GSH announced the development of their new cancer center. On June 26, 2014, Attorney Iles Cooper for LVCC sent a letter to Longo addressing the recent announcement and Dr. Unal's concerns for treatment in the area. The letter also stated:

> As you are also probably aware, through your consultants interviews with Dr. Unal and tour of the Lebanon Valley Cancer Center, substantial investments have been made to modernize and upgrade the Center's equipment within the last two (2) years.

The purpose of my writing is to determine the interest of GSH in developing a collaborative cancer model for the Lebanon Valley service area which would include Dr. Unal and the Center in the long-term plans of GSH.

On behalf of Dr. Unal and the Center, I believe it would be constructive to hold a meeting between the parties to explore the best use of limited community resources for the best possible outcomes for cancer care.

If you believe a meeting would be mutually desirable, please have your assistant contact me with your availability.

In addition to the letter, Plaintiff, through Dr. Unal, hired an outside advertising firm to create and publish advertisements and articles addressing the construction of the new cancer center. These articles included statements on GSH's use of tax dollars, laying off employees, and wrongfully competing with Plaintiff. These articles were then printed in the Lebanon Daily News, Penn Live, and other online and print sources.

While the new cancer center was under construction in October 2015, Plaintiff argues GSH stopped referring patients to LVCC in order to put Plaintiff out of business. Plaintiff states that on behalf of GSH, Longo and Smith directed oncologists at GSH to stop referring patients to LVCC. Specifically, Plaintiff claims Drs. Karla Ludwig, Riben Perez, Neenos Al-Noor, and Muhammad Khan refused to refer patients to Plaintiff or any radiation oncologists in order to create a backlog of patients for the new cancer center. Plaintiff states these employees also told patients to retrieve their records from Plaintiff because Plaintiff was going out of business. Within the Complaint, Plaintiff provides a detailed list of patients who they argue were wrongly diverted away from treatment with LVCC by GSH. The dates of diversion range from September of 2015 to April of 2016. GSH denies any

6

patients were told Plaintiff was closing or that they stopped referring to LVCC before GSH's cancer center opened.

The Sechler Family Cancer Center (SFCC) eventually opened at GSH in January of 2016. Until the opening of the facility, GSH had never previously provided radiation oncology services.

In August of 2016, LVCC closed. After closing, Plaintiff hired Michael Andrew Elinsky (hereinafter "Elinsky") to assess business damages. Elinsky issued two reports: one addressing Plaintiff's damages and the other addressing the relationship between Plaintiff and GSH. The Elinsky Report opined that there was a confidential relationship between the parties and GSH abused its confidential position by seeking information from LVCC after GSH had decided to open their own cancer center. The Elinsky Report also stated that these actions by GSH support the position of an agreement between the parties and GSH thereby breached its duty by acting with the intent to harm LVCC through fraud or deception. **Plaintiff Ex. 4.**

## II.    PROCEDURAL HISTORY

This case was initiated on December 1, 2015, by Writ of Summons. The Complaint alleges eight (8) counts including: (1) Breach of Fiduciary Duty against Good Samaritan Hospital and Robert Longo; (2) Breach of Fiduciary Duty against WellSpan and Robert Longo; (3) Violation of the Pennsylvania Trade Secrets Act against all Defendants; (4) Civil Conspiracy against Good Samaritan Hospital and WellSpan; (5) Intentional Misrepresentation against Good Samaritan Hospital and Robert Longo; (6) Negligent Misrepresentation against Good Samaritan Hospital and Robert Longo; (7) Tortious Interference with Existing Contractual Relations against Good Samaritan Hospital; and (8) Tortious Interference with Prospective Contractual Relations against Good Samaritan Hospital. After multiple protective

orders, preliminary objections, and miscellaneous Orders, Plaintiff filed a Second Amended Complaint on December 28, 2017.

Defendants filed their Answer, New Matter, and Counterclaim on January 16, 2018. Plaintiff filed Preliminary Objections on February 5, 2018. In response, Defendants filed an Amended Answer, New Matter, and Counterclaim on February 6, 2018, thereby mooting Plaintiff's Preliminary Objections. Plaintiff then filed Preliminary Objections to the Amended Answer, New Matter, and Counterclaim on February 23, 2018. An Order and Opinion addressing these Preliminary Objections was issued on September 17, 2018. Defendants then filed a Second Amended Counterclaim, Answer, and New Matter on November 16, 2018. Plaintiff filed Preliminary Objections to Defendants' Second Amended Counterclaim, Answer, and New Matter on December 7, 2018. Defendants did not file a brief addressing the Preliminary Objections. Plaintiff then filed a motion to close discovery.

On September 16, 2019, Defendants filed a motion for Summary Judgment. This case was listed for oral argument on November 19, 2019. Both parties have submitted briefs on the issues. The parties have agreed that the relevant pleadings and discovery are closed. This matter is now ripe for disposition.

III. **STANDARD OF REVIEW**

Summary judgment should be granted whenever the pleadings, depositions, answers to interrogatories, admissions, and affidavits demonstrate there is no issue of material fact and that the moving party is entitled to judgment as a matter of law. **Pa. R. Civ. P. 1035.1-5**. The moving party has the burden of proving that there is no genuine issue of material fact, and the record must be viewed in the light most favorable to the non-moving party. ***Thompson Coal Co. v. Pike Coal Co.***, 412 A.2d 466 (Pa. 1979); ***Davis v. Pennzoil***, 264 A.2d 597 (Pa. 1970). Once the moving party

8

establishes that there is no issue of material fact, the adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response. **Pa. R. Civ. P. 1035.3.** Summary judgment should only be granted where the right is clear and free from doubt, and any doubt must be resolved against the moving party. *Musser v. Vilsmeier Auction Co. Inc.*, 562 A.2d 279, 280 (Pa. 1989); *Davis v. Pennzoil*, 264 A.2d 597 (Pa. 1970). The court must consider uncontroverted facts in the non-moving party's pleadings and ignore controverted facts. *Hower v. Whitmark Assocs.*, 538 A.2d 524, 525 (Pa. Super. 1988).

Averments in a pleading to which a responsive pleading is required are admitted when not denied specifically or by necessary implication. **Pa. R. Civ. P. 1029(b).** A general denial or a demand for proof has the effect of an admission. **Pa. R. Civ. P. 1029(b).** The pleadings should be examined as a whole in determining whether a party has admitted the material factual allegations of a pleading. *Kappe Associates, Inc. v. Aetna Cas. & Sur. Co.*, 341 A.2d 516 (Pa. Super. 1975). "Where a motion for summary judgment has been made and properly supported, the party seeking to avoid the imposition of summary judgment must show by specific facts in their depositions, answers to interrogatories, admissions, or affidavits that there is a genuine issue for trial." *Marks v. Tasman*, 589 A.2d 205, 206 (Pa. 1991). "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof… establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT*, 744 A.2d 1276, 1277 (Pa. 2000). Therefore, "[a] proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense." *Gateway Towers Condo. Ass'n v. Krohn*, 845 A.2d 855, 858 (Pa. Super. 2004) (quoting *McCarthy v. Dan Lepore & Sons Co., Inc.*, 724 A.2d 938, 940 (Pa. Super. 1998)).

## IV. DISCUSSION

Defendants filed a motion for Summary Judgment against all eight (8) counts raised in the Amended Complaint. Defendants also made two additional arguments regarding Dr. Unal's previous statements and the admissibility of the Elinsky Report. Based on Defendants' brief, Plaintiff made an additional argument regarding Defendants' reliance on Bookbinder's deposition. The Court will combine the analysis for Counts I and II, Counts V and VI, and Counts VII and VIII, but will address all other arguments separately. In addition, this Court will also address Defendants Second Amended Counterclaim.

## A. ADMISSIBILITY OF DR. UNAL'S PREVIOUS STATEMENTS

Defendants argue Dr. Unal's statements are not admissible and cannot form the basis of a defense to summary judgment. Specifically, Defendants argue there was no opportunity to cross-examine Dr. Unal and he is now unavailable. Therefore, Defendants claim all statements offered by Dr. Unal are inadmissible and any witness who relies solely upon Dr. Unal's inadmissible statements cannot offer testimony.

Under Rule 804 of the Pennsylvania Rules of Evidence, a declarant is considered to be unavailable as a witness if the declarant cannot be present or testify at the trial or hearing because of death. **Pa. R. E. 804(4)**. An unavailable witness's prior testimony may be admitted provided the opposing party had a "full opportunity to cross-examine that witness at a prior proceeding. *Commonwealth v. Johnson*, 758 A.2d 166, 169 (Pa. Super. 2000). If the opposing party has not had a full and fair opportunity to cross-examine an unavailable witness, the testimony is not admissible at trial. *Commonwealth v. Bazemore*, 614 A.2d 684, 685-686 (Pa. 1992). A motion for summary judgment cannot be supported or defeated by

statements that include inadmissible hearsay evidence. *Botkin v. Metropolitan Life Ins. Co.*, 907 A.2d 641, 649 (Pa. Super. 2006).

Here, there is no question that Dr. Unal is an unavailable witness. Unfortunately, Dr. Unal died and therefore could not be cross-examined by Defendants. As such, any statements made by Dr. Unal or witnesses that rely solely on his statements are inadmissible. Thus, these statements may not be used to defeat Defendant's Motion for Summary Judgment and the Court will not consider them.

## B. BREACH OF FIDUCIARY DUTY AGAINST GOOD SAMARITAN HOSPITAL, WELLSPAN, AND ROBERT LONGO

Defendants argue there is not sufficient evidence to establish a partnership was formed between the parties. Defendants claim there is no evidence of record Defendants ever intended or discussed making Plaintiff a "co-owner of a business for profit" like Plaintiff claims. In addition, Defendants state that Plaintiff failed to provide facts sufficient to establish the requirements to create a joint venture. Defendants argue Plaintiff has failed to bring to light any facts or evidence, documentary or otherwise, sufficient to create an inference that there was a "joint proprietary interest" or the "right of mutual control" that is required to create a joint venture. Defendants also claim there are no allegations that any profit sharing was intended or discussed by any of the parties. Therefore, as there is no confidential relationship nor any fiduciary duty, Defendants argue summary judgment should be granted in favor of Count I and Count II.

Plaintiff argues the evidence shows Defendants breached a confidential relationship and therefore breached their fiduciary duty as part of a joint venture or as part of a partnership. Specifically, Plaintiff claims that Nancy Bookbinder told Dr. Unal their conversations were confidential. Due to this assurance, Plaintiff

argues Dr. Unal discussed confidential information regarding treatments, referrals, and evaluations. In addition, Plaintiff claims that both McCoy and Dr. Castro provided proprietary information to Kelly Smith on the grounds that the two would be working together. Plaintiff argues this information is enough for a jury to conclude that there was a confidential and fiduciary relationship between the parties.

Finally, Plaintiff claims there is sufficient documentary evidence to support such a relationship when considering ORC's documents, the Hospital's emails, and Robert Longo, as the head of the working group, inviting Dr. Unal to meet with the working group. Regardless of these documents, Plaintiff also argues that creating a confidential relationship does not require a written contract. Plaintiff states that a fiduciary duty in a joint venture attaches once negotiations being.

Under Pennsylvania law, a partnership is "an association of two or more persons to carry on as co-owners of a business for profit, whether or not the persons intended to form a partnership." **15 Pa. C.S.A. § 8422(a)**. In order to determine whether a partnership has been formed, the following rules apply: (1) joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property; (2) the sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived; and (3) a person who receives a share of the profits of a business is presumed to be a partner in the business unless an exception applies. *Id.*

On the other hand, a joint venture is not a status created or imposed by law but is instead a relationship voluntarily assumed and arising wholly from contract. *Snellbaker v. Herrmann*, 462 A.2d 713, 716 (Pa. Super. 1983). For a relationship to be a joint venture, the following factors are essential: (1) each party to the

venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a "joint property interest and right of mutual control over the subject matter" of the enterprise; and (4) usually, there is a single business transaction rather than a general and continuous transaction. *Snellbaker*, 462 A.2d at 716 (citing *McRoberts v. Phelps*, 138 A.2d 439, 443-444 (Pa. 1958)). A joint venture is similar in many ways to that of a partnership, the principal difference being that it usually, though not always, applies to a single transaction instead of being formed for the conduct of a continuing business. *West v. People First National Bank & Trust Co.*, 106 A.2d 427, 431 (Pa. 1954).

In both a partnership and a joint venture, a fiduciary duty exists between the parties. *Snellbaker*, 462 A.2d at 718; *Clement v. Clement*, 260 A.2d 728, 729 (Pa. 1970). A fiduciary duty is the highest duty implied by law. *Miller v. Keystone Ins. Co.*, 636 A.2d 1109, 1116 (Pa. 1994). This duty requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information. *Yenchi v. Ameriprise Financial, Inc.*, 161 A.3d 811, 819-820 (Pa. 2017); *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000). A fiduciary duty will be imposed only where the attendant conditions make it certain that a fiduciary relationship exists. *Yenchi*, 161 A.3d at 820.

A fiduciary duty does not arise merely because one party relies on and pays for the specialized skill of the other party. *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa. Super. 2002). Specifically, the critical question for establishing a fiduciary relationship is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side, which results in the effective ceding of control over decision-making by

13

the party whose property is being taken. *Yenchi*, 161 A.3d at 823 (citing *eToll, Inc.*, 811 A.2d at 23 (holding that although an advertising company was a "trusted advisor" to a software developer, no fiduciary relationship existed between the parties).

In this case, the Court finds there was no fiduciary duty between the parties. First, neither a partnership nor a joint venture was ever created. There is no evidence profits were ever shared or that Plaintiff had any "right of mutual control," which is fundamental to the creation of both relationships. Second, there is no evidence of any transactions, contracts, or repeated business transactions. While LVCC gave Defendants a QA summary and provided training for GSH because Dr. Unal believed the two would be working together, there is no indication that was ever the intent of GSH. Bookbinder did meet with Dr. Unal confidentially, as she did with multiple physicians in the area, but both her notes and her testimony indicate there was never any talk of hiring Dr. Unal or collaborating with LVCC to create a joint cancer center. This is also true for both Longo and WellSpan, who have had even fewer interactions with Plaintiff than GSH.

Additionally, as Bookbinder indicated, the ORC goal of discussing with LVCC the potential for co-locating appear to be just that – a goal. There is no evidence presented that GSH acted on that goal or created an actual plan to join forces with LVCC. The letter sent on behalf of Dr. Unal in June of 2014 also supports this lack of an agreement. The letter indicates interest in collaborating and exploring the possibility of the parties working together, further undermining Plaintiff's belief a deal had already been struck with Defendants. In addition, the advertisements published by Plaintiff against GSH support the conclusions that not only was there no contract between the parties, but that Plaintiff was well aware they would not be working together in the future.

14

The same is also true for the financial analysis of SFCC. While ORC indicated the new cancer center would lose money if LVCC remained in business, there is no indication GSH moved against LVCC or purposely tried to use any information obtained to undermine LVCC. The financial report provides a clear picture of a financial future for a new cancer center, but does not indicate GSH intended or did take action against LVCC. As there was no fiduciary duty created by either a joint venture or a partnership, and there was no action on the part of GSH to breach a fiduciary duty even if one had been created, Counts I and II of the Amended Complaint must be dismissed.

## C. VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT AGAINST ALL DEFENDANTS

First, Defendants argue the three-year statute of limitations expired in 2015, prior to filing the Writ of Summons. Specifically, Defendants argue Dr. Colkitt testified that in early 2012, there was no longer any indication of forward movement between the parties. Defendants state that at that time, Plaintiff either knew or should have known whether a cause of action existed.

Second, regardless of the statute of limitations, Defendants state there is no evidence to substantiate a violation of the Uniform Trade Secrets Act. Defendants claim that in response to Discovery, Plaintiff stated it failed to retain any documents allegedly provided to Nancy Bookbinder that would constitute the confidential information provided by Dr. Unal. Defendants argue Plaintiff can produce only one document, an eight-page quality assurance summary provided to Defendants, which addressed one quarter of 2014. In addition, when Kelly Smith met with Susan McCoy at Plaintiff's facility, Ms. Smith took less than one page of notes on a small notepad between 8:30 a.m. to 1:30 p.m. As these are the only

15

documents that transferred between the parties, Defendants argue there is no evidence that any trade secrets were exchanged or used.

Plaintiff first argues the statute of limitations has not expired because in both 2013 and 2014, Defendants obtained proprietary information based on the premise of working together to jointly develop a cancer center. Second, Plaintiff argues that Defendants did in fact receive confidential information as shown by the testimony of McCoy, Dr. Castro, Bookbinder, and the Elinsky Report. Plaintiff states that Defendants obtained this information by improper means when they agreed to keep this information confidential under the assumption that the parties would be developing a joint cancer center.

The Pennsylvania Uniform Trade Secrets Act (hereinafter "the Act") allows a court to issue injunctive relief, based on threatened or actual misappropriation of a trade secret. **12 Pa. C.S.A. §5302-5303.** In order to state a claim under the Act, the disputed information must first qualify as a trade secret. *Pestco, Inc. v. Associated Products, Inc.,* 880 A.2d 700, 706 (Pa. Super. 2005). A trade secret is defined as information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, other persons who can obtain economic value from its disclosure or use; and (2) is the subject or efforts that are reasonable under the circumstances to maintain its secrecy. **12 Pa. C.S.A. §5302.**

No bright line rule exists on what constitutes a trade secret; rather, the issue is analyzed on a case-by-case basis. *Pestco, Inc.,* 880 A.2d at 706. Several factors are relevant to the analysis including: (1) the extent to which the information is known outside of the company's business; (2) the extent to which it is known by employees and persons inside the company; (3) the extent of measures the

16

employer has taken to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Crum v. Bridgestone/Firestone North American Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. 2006). "The crucial *indicia* for determining whether certain information constitutes a trade secret are 'substantial secrecy and competitive value to the owner.'" *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. 2003).

In this case, there is no evidence Defendants violated the Uniform Trade Secrets Act. First, the notes taken by Smith from the meeting at LVCC with McCoy are insufficient to constitute a trade secret. From the short period of time spent at LVCC and the minimal amount of notes taken, it does not appear that Smith obtained any secret information. In addition, Plaintiff is unable to articulate any specific trade secret that Smith might have obtained or used that was of competitive value to Plaintiff.

Second, the eight-page 2014 Quality Assurance summary given to Defendants by McCoy and Dr. Castro cannot be considered a trade secret. The summary provides a small look into LVCC. While this information is potentially helpful to either Plaintiff or Defendant, it does not amount to the level of valuable, secret information that is of great importance to LVCC. In addition, Plaintiff readily gave the information to Defendants and it does not appear that any "improper means" were used to obtain the summary. As stated above, there is no evidence Defendants ever actively moved to create a joint cancer center with Plaintiff. As such, Plaintiff's incorrect assumption or belief that they would be working together with Defendants and thereby giving Defendants the summary would not establish improper means on Defendants part.

17

Third, as stated above, there is no evidence Bookbinder obtained any confidential information from her meetings with Dr. Unal. Therefore, Count III for violation of the Uniform Trade Secrets Act must be dismissed. As such, whether or not the statute of limitations had expired on this claim is irrelevant.

## D. CIVIL CONSPIRACY AGAINST GOOD SAMARITAN HOSPITAL AND WELLSPAN

Defendants argue all actions within the Complaint took place before WellSpan joined with GSH. Therefore, Defendants claim, because the civil conspiracy is only actionable against GSH and GSH cannot conspire with itself, there cannot be a valid claim for civil conspiracy. In addition, Defendants argue Plaintiff has failed to provide the documents necessary to support a claim for civil conspiracy and summary judgment must therefore be granted.

Plaintiff argues admissions within the pleadings establish that WellSpan came into the picture in 2013, well within the time frame to be a party to civil conspiracy. Plaintiff also argues that the documents in this case show WellSpan was concerned about the cancer center and needed Plaintiff out of business in order for Defendants to not lose millions. Plaintiff also claims that WellSpan was involved in determining that Dr. Unal should not be hired and WellSpan requested that GSH keep Dr. Unal uninformed about the progress of the cancer center. As such, Plaintiff argues Defendants have failed to show that summary judgment is "free and clear from doubt" and the Court should deny their motion.

In order to establish civil conspiracy, it must be shown that two or more persons combined or agreed with the intent to do an unlawful act or to do an otherwise lawful act by unlawful means. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). Proof of malice, or an intent to injure, is an essential element to prove conspiracy. *Id.* A conspiracy becomes actionable when some overt act is

18

done in pursuance of the common purpose or design held by the conspirators and actual legal damage results. *Baker v. Rangos*, 324 A.2d 498 (Pa. Super. 1974). When a plaintiff relies on subsequent acts to establish conspiracy, these acts must be such as to clearly indicate the prior collusive combination not slight circumstances of suspicion. *Id.* (citing *Novic v. Fenics*, 11 A.2d 871, 874 (Pa. 1940). These subsequent acts must be such as to warrant the belief and justify the conclusion that the subsequent acts were done in furtherance of the unlawful combination. *Id.*

Here, Plaintiff has failed to establish who the conspirators were, what overt act was done in furtherance of the conspiracy, and any actual legal damage that resulted from the said conspiracy. Plaintiff mentions GSH's association with WellSpan. However, besides GSH joining with WellSpan around 2015, there is no evidence presented that WellSpan had any connection or contact with Plaintiff.

Second, Plaintiff can only offer suspicions that Defendants must have worked together to undermine Plaintiff. There is no proof of malice within the record to establish a conspiracy. Any actions or events Plaintiff cites to, such as the probable and optimal case within the ORC report, are only speculations as to Defendants' intent. These beliefs are insufficient to establish civil conspiracy and Count IV therefore must be dismissed.

## E. INTENTIONAL AND NEGLIGENT MISREPRESENTATION AGAINST GOOD SAMARITAN HOSPITAL AND ROBERT LONGO

Defendants argue there is not sufficient evidence to show that any representations were made to Dr. Unal or any other Plaintiff. Defendants claim there is no evidence of record Defendants ever intended or discussed making Plaintiff a "co-owner of a business for profit" like Plaintiff claims. In addition, Defendants argue Plaintiff has failed to bring to light any facts or evidence,

19

documentary or otherwise, sufficient to show a confidential relationship or any fiduciary duty.

Plaintiff argues a jury could find that GSH had a confidential relationship with Plaintiff in "co-locating" LVCC with the new cancer center. Plaintiff claims that Plaintiff was misled about GSH's true intention to jointly develop a center together.

The essential elements of a cause of action for fraud or deceit are misrepresentation, fraudulent utterance thereof, intention to induce action thereby, justifiable reliance thereon, and damage as a proximate result. *Wilson v. Donegal Mut. Ins. Co.*, 598 A.2d 1310, 1315 (Pa. Super. 1991) (citing *Neuman v. Corn Exchange National Bank & Trust Co.*, 51 A.2d 759 (Pa. 1947)). To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage. *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243 (Pa. 1983). This may take the form of false or misleading allegations or by concealment of that which should be disclosed, which deceives or is intended to deceive another to act upon it to detriment. *Id.*

A negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the representor ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994) (citing **Restatement (Second) of Torts § 552**. Ultimately, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue but must have failed to make reasonable investigation of the truth of those words. *Id.*

Here, there is no evidence that any misrepresentations, let alone any fraudulent utterances, were ever made in this case. There are no statements made to Plaintiff or admissions by Defendant that would support a viable claim. Ultimately, the only evidence Plaintiff relies on are actions of LVCC's employees based on the belief Dr. Unal had that a deal with GSH had been made. However, Plaintiff's reliance on that belief without sufficient evidence supporting an agreement or intent to form a partnership are insufficient to establish either intentional or negligent misrepresentation. Plaintiff cannot cite to any other statements, documents, or claims made by Defendants that would qualify as a misrepresentation. As such, Count V and VI must be dismissed.

## F. TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS AGAINST GOOD SAMARITAN HOSPITAL

Defendants argue Plaintiff has no sufficient evidence to create any issue of fact that Defendant ever tortuously interfered with patients and directed patients to other care providers. Defendants claim that the Second Amended Complaint accuses Defendant Longo and Kelly Smith that they directed Drs. Ludwig, Perez, Al-Noor, and Khan to refuse to refer patients to Plaintiff beginning in October of 2015. However, Defendants state that Dr. Khan did not work at GSH until after the inception of this suit. Likewise, Defendants claims that Dr. Colkitt testified that Dr. Ludwig "never sent any patients anyway." **Plaintiff Ex. 48.** In addition, Defendants argue Plaintiff has no evidence that Defendant Longo or Kelly Smith ever directed anyone to divert patients or that a single patient was actually diverted. As such, Defendants argue there is not sufficient evidence to create any issue of fact that Defendants tortuously interfered with patients.

Plaintiff argues the evidence shows Defendants interfered with patient referrals. First, Plaintiff argues the affidavit of Dr. Colkitt shows that consults from outside referrals to Plaintiff's center dropped to almost nothing from October to November of 2015, months before SFCC opened. Since there was no other radiation center in Lebanon, Plaintiff states a jury could find that Defendants were holding patients back for months until its own cancer center opened. Plaintiff also claims there is evidence that GSH was telling LVCC patients that Plaintiff was closing even before SFCC officially opened. Finally, Plaintiff argues they are not required to identify who was referring patients away from LVCC. Plaintiff states the evidence provided showing GSH interfered with LVCC patients is enough to deny the Motion for Summary Judgment.

In order to set forth a legally sufficient cause of action for intentional interference with contractual or prospective contractual relations, four elements must be pled: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Cmwlth. 2014) (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (1971). It is important to note that interference is an intentional tort, meaning the actor is acting as he does for the purpose of causing harm to the Plaintiff. *Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971). "The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract." *Id.*

After reviewing the record, there is no evidence indicating Defendants acted to interfere with Plaintiff's patients. In fact, the testimony of McCoy indicates there is

22

no indication GSH held any patients back, but that Plaintiff simply noticed a "somewhat decrease of patients in October, November, December" of 2015. **Plaintiff Ex. 46 P. 104.** Plaintiff also fails to articulate who specifically interfered with patients and how patients were withheld from Plaintiff. In answers provided during discovery, Plaintiff responded "Unknown" to who at GSH interfered with patients. **Defendants Ex. D.** Plaintiff speculates regarding actions GSH may have taken, but this is insufficient to meet the standards required under intentional interference.

In addition, Plaintiff has not indicated which patients were existing patients and which were prospective patients. Plaintiff mentions patients who were told LVCC was closing but the patients, who were not deposed, were unable to say who told them LVCC was closing. The other patients listed by Plaintiff who stopped treatment at LVCC and began treatment at SFCC, started treatment at SFCC after the new center opened. While it does appear from Plaintiff's brief and complaint that the patients were current patients with Plaintiff when they switched treatment to SFCC, Plaintiff is missing key facts for an intentional interference. Plaintiff does not state any purposeful action or statements made by Defendants to interfere with any patients. Without any evidence of direct steps taken by Defendants, there is no indication of why the patients left LVCC.

Finally, in the absence of any contract between GSH and Plaintiff, there is no duty on the part of GSH or its affiliated doctors to refer patients to any specific providers. GSH would therefore not be required to continue to refer patients to Plaintiff just because they had referred patients there in the past. As such, Count VII and Count VIII must be dismissed.

## G. ADMISSIBLITY OF MICHAEL ELINSKY'S REPORT

Defendants argue the Elinsky Report is inadmissible and Plaintiff cannot use the report to defeat this Motion. Defendants claim that the Elinksy Report reviewed no Interrogatory responses, no Request for Production of Document responses, and only considered four of twenty depositions. In addition, Defendants claim that when Michael Elinksy drafted the report, he never reviewed the actual eight-page quality assurance document provided by Susan McCoy, Officer Manager for Dr. Unal. Defendants also state that the report relies on statements made by Dr. Unal, which should be inadmissible in this matter. Finally, Defendants claim that since an expert cannot testify on the ultimate question of fact in any civil proceeding, the report should not be allowed. As a result, Defendants argue the report cannot be relied upon to show the existence of a confidential relationship between the parties or even that negotiations took place.

Plaintiff first argues the Elinsky report only opines on the ultimate issue of the formation of an agreement in a few sentences within his detailed four-page report. As such, Plaintiff claims the remainder of the report must be considered. Next, Plaintiff states that Defendants mistake the law on both the ultimate issue and what an expert may base his opinion upon. Plaintiff also states that Defendants' attack on Elinsky's credibility for the information he relied on to form his opinion is unacceptable at this stage in the proceedings. Plaintiff argues it is up to a jury to determine credibility, not the Court at summary judgment. Finally, Plaintiff states that Elinsky did in fact use the eight-page quality assurance summary to support his opinion that GSH had obtained confidential information under the premise that Plaintiff and Defendants would be working together. Therefore, Plaintiff argues this report, in and of itself, creates a genuine issue of material fact and is sufficient to deny the Motion for Summary Judgment.

An expert report must be supported by the record. *Downey v. Crozer-Chester Medical Center*, 817 A.2d 517, 528 (Pa. Super. 2003). Specifically, an expert's opinion must reference facts, testimony, or empirical data and must delineate how the opinion, based on the record, gives rise to a genuine issue of material fact. *Id.* Without such support, there can be no prima facie case to overcome a summary judgment motion. *Id.*[1]

In this case, the expert report implies that the transactions between the parties must mean an agreement was reached. Specifically, the report states "It is common for companies to reach meaningful agreements, which may be written or verbal, with each other prior to engaging lawyers to prepare final documents... [T]he numerous meaningful direct actions of the parties [] clearly demonstrate that an agreement was reached and acted upon." **Plaintiff Ex. 4.** One of the "numerous" actions the report relies upon are apparent beliefs by Dr. Unal that GSH and LVCC would be working together which resulted in him sending over a QA report of LVCC. However, without Dr. Unal, there is no evidence from GSH or other LVCC employees that the documents sent to GSH were the result of an agreement between the parties. In addition, none of Bookbinder's notes from 2007 or 2011 indicate an agreement had been reached or that GSH intended to partner with LVCC. The notes state that Dr. Unal had to discuss with his business partners "with respect to any business opportunities," but this statement is much too vague to conclude that GSH was asking to collaborate with LVCC.

The report also relies on the ORC report and training with Smith. As already addressed, there is not sufficient evidence in either the report or the short training

---

[1] See also *Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 808 A.2d 178 (Pa. Super. 2002) (affirming entry of summary judgment where an expert's opinion contained within a report, failed to point to specific facts, testimony, or empirical data for support); *Checchio v. Frankford Hospital*, 717 A.2d 1058, 1062 (Pa. 1998) (affirmed summary judgment where expert opinion was based entirely on subjective assessments).

session with Smith that either GSH wanted to interfere with LVCC or that an agreement had been reached. Without any direct statements, concrete evidence, or documents demonstrating either an agreement had been reached or a confidential relationship had been established, the conclusions in the report are speculative at best. Ultimately, the report reviewed small amounts of testimony and very few documents but still makes broad statements and conclusions without citing specific evidence. This conclusion is therefore not well founded and would be prejudicial to a potential jury. Based on these findings, this Court will not consider the report in defending the motion for summary judgment. Since the Court will not use the report in the summary judgment analysis, whether or not the report opines on an ultimate issue of law or fact is irrelevant to this analysis.

## H. DEFENDANTS' RELIANCE ON BOOKBINDER'S DEPOSITION IN VIOLATION OF NANTY-GLO

Plaintiff argues Bookbinder, as president of ORC, was GSH's agent. Plaintiff argues that as GSH's agent, Bookbinder, took thousands of pages of notes and analyzed years of data. As such, Plaintiff argues, Defendants' reliance on Bookbinder in their brief violates the standard for granting summary judgment. Plaintiff claims a party cannot rely on the testimony of its own witnesses to show that the party is entitled to summary judgment. Therefore, Plaintiff argues the motion should be denied.

Defendants argue Bookbinder is not an agent of GSH but is instead an independent contractor. As such, GSH is not bound by any of Bookbinder's actions. In addition, since Bookbinder is not part of GSH, Nanty-Glo does not apply to this case.

Under the Nanty-Glo rule, summary judgment is prohibited where the moving party relies exclusively on oral testimony, either through testimonial affidavits or

26

deposition testimony, to establish the absence of a genuine issue of material fact. *Lineberger v. Wyeth*, 894 A.2d 141 (Pa. Super. 2006). "Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the jury. *Penn Center House, Inc. v. Hoffman*, 553 A.2d 900 (Pa. 1989) (quoting *Goodrich-Amram*. 2d § 1035(b): 4 at P. 434-35).

Here, while it is true that Defendants do quote Bookbinder, they do not solely rely on her testimony. In fact, Defendants mostly rely on the absence of evidence within the record to establish any of Plaintiff's claims. As explained above, the evidentiary record contains insufficient evidence of facts to make out a *prima facie* cause of action. The action is consequently dismissed for a failure to make out a *prima facie* case, not for lack of a genuine issue of material fact. Therefore, whether or not Defendants relied on Bookbinder in violation of Nanty-Glo to establish the absence of a genuine issue of material fact is insignificant. As such, whether or not Bookbinder is GSH's agent and if Defendants may rely on her testimony is irrelevant.

# I. DEFENDANTS SECOND AMENDED COUNTERCLAIM

Defendants filed a Counterclaim against Plaintiff arguing Plaintiff engaged in a smear campaign against Defendants that resulted in tortious interference with prospective contractual relations. Specifically, Defendants argue Plaintiff lied and/or misled readers of advertisements and articles that stated false accusations against Defendants. Defendants claim these statements misled prospective patients and resulted in patients being deterred from receiving treatment at SFCC.

Plaintiff has filed several Preliminary Objections against this Counterclaim that have resulted in a final Second Amended Counterclaim filed on November 16,

27

2018. After reviewing the record, it does not appear that Defendants filed a brief in response to the Preliminary Objection or that the Court ever addressed the Preliminary Objections. As such, even though the pleadings and discovery have closed, the Court will briefly address the Counterclaim.

Under Pennsylvania law, a cause of action for interference with prospective contractual relations requires: (1) a prospective contractual relationship; (2) purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on the part of the defendant; and (4) occasioning of actual damage resulting from defendant's conduct. *Foster v. UPMC South Side Hosp.*, 2 A.3d 655, 665 (Pa. Super. 2010) (quoting **Restatement (Second) of Torts § 766B**). This relationship must have a reasonable likelihood or probability, and there must be something more than a mere hope or the innate optimism of the salesman. *Glenn v. Point Park College*, 272 A.2d 895, 898-99 (Pa. 1971); *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979).

Here, Defendants have failed to show anything more than a mere hope of prospective patients. Defendants do not name any individual patients that were deterred by Plaintiff's actions. In addition, Defendants cannot articulate any actual damage that resulted from Plaintiff's conduct. The damages and the loss of potential patients stated in the Counterclaim are speculative at best. As such, Defendants cannot meet the requirements for establishing a cause of action for tortious interference with prospective contractual relationship and the Second Amended Counterclaim must be dismissed.

## V.   CONCLUSION

For the foregoing reasons, the evidentiary record contains insufficient evidence of facts to make out a *prima facie* cause of action. As such, Defendants' Motion for Summary Judgment is granted and the Complaint is dismissed with prejudice. In

28

addition, Defendants' Second Amended Counterclaim is dismissed with prejudice. An Order will be entered consistent with the foregoing.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Central Pennsylvania Radiation
Oncology, P.C., a Pennsylvania
corporation,

     Appellant

     v.

The Good Samaritan Hospital
of Lebanon, Pennsylvania, a
Pennsylvania Corporation,
WellSpan Health, a Pennsylvania
Corporation, and Robert Longo,
an adult Individual

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 1004 C.D. 2020
SUBMITTED: September 20, 2021

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE ELLEN CEISLER, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

***OPINION NOT REPORTED***

DISSENTING OPINION
BY JUDGE McCULLOUGH      FILED:  December 15, 2021

I must respectfully dissent.  Unlike the Majority, I believe the Court of Common Pleas of Lebanon County (trial court) erred as a matter of law when it granted the motion for summary judgment of The Good Samaritan Hospital of Lebanon (GSH), WellSpan Health, and Robert Longo (collectively, Defendants) and dismissed Central Pennsylvania Radiation Oncology, P.C.'s (Plaintiff) complaint with prejudice.

The facts are highly disputed and span the period from 2007-2015. There are hundreds of pages of depositions, from many witnesses.  Plaintiff's

medical director, who was the key person involved in the discussions with GSH and its agents, committed suicide just after this lawsuit was filed in 2015.

From even a cursory review of the trial court's opinion, it is clear to me that the trial court interpreted the record *against* Plaintiff, who was the non-moving party in the case, and made certain fact-based and credibility assessments, which have no place at the summary judgment stage. Accordingly, I would reverse and remand for further proceedings.

**Factual and Procedural History**

In 1988, Douglas R. Colkitt, M.D., built a radiation oncology center in Lebanon, Pennsylvania, that came to be called the Lebanon Valley Cancer Center (LVCC). In 1988, he hired Abdurrahman Unal, M.D., to serve as LVCC's Radiation Oncology Medical Director. In 1999, Dr. Unal took over ownership of LVCC and established Plaintiff Central Pennsylvania Oncology Center. In 2015, Dr. Colkitt took over ownership of Plaintiff as the sole shareholder. Until January of 2016 (when Defendants' new cancer center opened), Plaintiff was the only provider of radiation oncology in Lebanon.

In 2000, GSH suffered financial losses. During this time, Longo and GSH determined the hospital should open a new, comprehensive cancer center that would provide both medical oncology and radiation oncology. In 2007, GSH engaged Oncology Resource Consultants, Inc. (ORC) to advise GSH in developing the radiation oncology facet of the new cancer center. Nancy Bookbinder was ORC's president.

In the summer of 2007, Bookbinder, on behalf of GSH, reached out to Plaintiff, the only radiation oncology center in Lebanon, and met with Dr. Unal confidentially. As the trial court and Majority point out, the intent of the people

affiliated with GSH in arranging the meetings with Plaintiff and what occurred during those meetings is "disputed." (Trial ct. op. at 3; *Central Pennsylvania Radiation Oncology, P.C. v. The Good Samaritan Hospital of Lebanon, Pennsylvania*, (Pa. Cmwlth., No. 1004 C.D. 2020, filed December 15, 2021), slip op. at 2.)

On the one hand, Defendants allege that they were simply meeting with Plaintiff to gather general information about the need for a new cancer center, and that they never discussed joining forces with Plaintiff to create the new center. Plaintiff, on the other hand, alleges that after initial interviews by Nancy Bookbinder, further discussions took place during which Plaintiff was led to believe that Defendants were interested in working together with Plaintiff to create the new cancer center. According to Plaintiff, the parties came to an agreement that they would be working together in the new cancer center and in furtherance thereof. Plaintiff provided sensitive competitive and highly confidential financial and operational information, and the actual training of key personnel. However, allegedly unbeknownst to Plaintiff, Defendants had decided in 2012 that Plaintiff was a rival that needed to go out of business in order for the new cancer center to be financially viable. Specifically, the evidence shows that in September 2012, Nancy Bookbinder presented Defendants with "an optimal case scenario" that had Plaintiff closing and Dr. Unal out of the picture. (Reproduced Record (R.R.) at 799a, 808a.) This "optimal scenario" stated: "The freestanding radiation oncology practice in Lebanon is no longer in operation" and a "radiation oncologist is recruited to the community to develop the new radiation oncology program." *Id*. Under this scenario, Defendants' projected profits for the radiation business would rise over a five-year span to $3,695,242. *Id*.

Plaintiff alleges that Defendants kept Plaintiff in the dark about their new goal while sending its employees to Plaintiff for training and obtaining detailed confidential information from Plaintiff including its revenue, costs, profits, operational techniques, and marketing techniques, which Defendants later used to steal Plaintiff's radiation oncology patients and cause Plaintiff to close in August 2016.

Plaintiff initiated this matter because it is Plaintiff's belief that Defendants and their agent, Nancy Bookbinder, purposefully deceived Plaintiff for the purpose of learning confidential information from Plaintiff. Plaintiff claims that Defendants then used the confidential information to open a cancer center directly across the street from Plaintiff that ultimately destroyed Plaintiff's business.

Plaintiff's complaint alleges eight counts including: (1) Breach of Fiduciary Duty against GSH and Robert Longo; (2) Breach of Fiduciary Duty against WellSpan and Robert Longo; (3) Violation of the Pennsylvania Trade Secrets Act[1] against all Defendants; (4) Civil Conspiracy against GSH and WellSpan;[2] (5) Intentional Misrepresentation against GSH and Robert Longo; (6) Negligent Misrepresentation against GSH and Robert Longo; (7) Tortious Interference with Existing Contractual Relations against GSH; and (8) Tortious Interference with Prospective Contractual Relations against GSH. (Second Amended Complaint, R.R. at 23a-667a.)

Defendants filed an answer denying that there was any agreement to open a joint center or form any partnership or joint venture with Plaintiff. (Answer and New Matter to Second Amended Complaint, R.R. at 107a-44a.) Defendants

---

[1] 12 Pa.C.S. §§5301-5308.

[2] Plaintiff does not appeal the trial court's dismissal of its conspiracy claim.

PAM - 4

denied ever discussing joining forces with Plaintiff and denied that they ever obtained any confidential information from Plaintiff. Defendants alleged that the purpose of the meetings with Dr. Unal was simply to meet with local physicians to complete an analysis of local care.

The parties engaged in lengthy discovery, exchanging requests for admission, interrogatories, requests for documents, and depositions. On September 16, 2019, Defendants filed a motion for summary judgment, asserting that Plaintiff failed to support any of its claims with evidence sufficient to present a jury question. In opposition, Plaintiff presented a significant amount of evidence that negates Defendants' version of events, including:

- The Affidavit and deposition testimony of Plaintiff's radiation therapist and office manager, Susan McCoy, who attested that in 2013 or 2014, Defendants sent their Director of Oncology Practice to Plaintiff's facility for training on all aspects of radiation oncology under the premise that Plaintiff and Defendants would be working together at the new cancer center to be developed; that the information provided to Defendants during this training session was proprietary, which Plaintiff had developed over many years of practice, and which was extremely valuable to Plaintiff; that much of the information provided to Defendants could not be obtained except through trial and error by Plaintiff; that the information provided to Defendants included who Plaintiff's referrals came from, how Plaintiff created patient charts, the types of radiation oncology treatments Plaintiff provided, the numbers of radiation oncology treatments Plaintiff provides, the demographics of Plaintiff's patients, current insurance practices for radiation oncology, reimbursement from local providers, how Plaintiff made masks for head and neck patients, how the treatment planning software worked, how Plaintiff performed Quality Assurance, how Plaintiff staffed the center, how Plaintiff contracted with service providers on its machines, repair costs, bundling for insurance reimbursement processes, and how Plaintiff marketed to the local population; that most of what Plaintiff revealed to Defendants could not be gleaned from documents and could not be reconstructed without personal knowledge of Plaintiff or Dr. Unal; that providing this information to Defendants was part of Plaintiff's joining forces with Defendants in the new cancer center that was being developed; that it was her understanding that

Plaintiff was to co-locate its radiation oncology practice to a new building with the hospital-owned medical oncology practice; that the transfer of information to Defendants was supposed to be part of Defendants and Plaintiff working together; that had she known Defendants intended to compete directly with Plaintiff, she would never have trained Defendants or discussed Plaintiff's confidential proprietary information with Defendants; that in the fall of 2015 - as the new cancer center construction was close to completion, Plaintiff's referrals from Defendants-affiliated doctors, including medical oncologists fell dramatically; that Defendants were holding patients needing radiation therapy so that when the new center opened it would have a large number of patients and Plaintiff would have very few, that when the new center opened in January 2016; that Plaintiff's existing patients were told that Plaintiff was "closing" and that they should transfer treatment to Defendants' new center; that she had multiple conversations with Plaintiff's patients who advised her that they were told by Defendants that Plaintiff was closing and that they even needed to transfer their treatments in the middle of receiving their 6-8 weeks of radiation treatment; that Roseanne O., Michael S., Bonnie U., and Judith H., all stopped treating mid-stream at Plaintiff to treat at Defendants. (Affidavit of Susan McCoy; R.R. at 1464a-68a; Deposition of Susan McCoy, R.R. at 1146a-80a.)

- The Affidavit and deposition of Paul M. Castro, Ph.D., a medical physicist who provided medical physics services to Plaintiff, who attested that in 2014 at the request of Dr. Unal he provided Plaintiff's proprietary quality assurance (QA) documents to Defendants with the understanding that Plaintiff was working with Defendants in the development of a new cancer center and that the detailed physics operation procedures used by Plaintiff would be used to obtain accreditation of the new cancer program; that he only provided these QA documents to Defendants because he believed that they were to be used as a part of a joint effort in developing the new cancer center; that there was no other reason for him to provide them; and that he and Plaintiff had developed the QA program and it was highly valuable to the radiation oncology practice. (Affidavit of Paul M. Castro, Ph.D., (R.R. at 1585a-87a; Deposition of Paul M. Castro, Ph.D., R.R. at 1183a-94a, 1633a.)

- The Affidavit and deposition testimony of Douglas R. Colkitt, M.D., friend, associate, and employer of Dr. Unal, who attested that Dr. Unal completely opened the facts, figures, details, and confidential information of his practice to Nancy Bookbinder because he was advised that he would be a partner in the new cancer center and the Medical Director, with the sharing of profits

between them, and the Defendants keeping about two-thirds of them; that he understood that the new center would be in a new building where Dr. Unal's radiation oncology practice would co-locate with Defendants' medical oncology practice so that cancer care would all be under one-roof in Lebanon, and that Defendants called Plaintiff and requested records of Plaintiff's existing patients who were in the midst of their treatment with Plaintiff. (Affidavit of Douglas R. Colkitt, M.D., R.R. at 1589a-91a, 1628a; Deposition of Douglas R. Colkitt, M.D., R.R. at 1204a-41a.)

- The expert report of Andrew Elinsky, opining that actions were taken by both parties that were consistent with standard business practices in negotiating for the development of a joint venture, including: an agreement on confidentiality for sharing meaningful and sensitive competitive and highly confidential financial and operational information, the actual training of key personnel on the grounds that the parties reached an agreement to be working together in the future, and the provision of important documents and knowhow developed by Plaintiff over many years, including any documents related to aiding the development of the new cancer center's QA program that Defendants needed to clear regulatory compliance, and the information Plaintiff provided to Defendants was highly valuable to a competitor entering into the market and was the kind of information commonly considered to be proprietary to a business.  (R.R. at 220a-23a.)

- Documents generated by Defendants and their agents, which established that Defendants' strategic goal in October 2007 was to "explore feasibility of co-location agreement for radiation therapy service with [Plaintiff]," to meet with Plaintiff to determine interest in and issues associated with potential co-location of radiation therapy services in a new ambulatory cancer center, and to invite Dr. Unal to discuss unifying efforts, and that Defendants did meet with Dr. Unal.  (R.R. at 699a, 718a, 723a.)

- Documents generated by Defendants and their agents, which established that in 2012, one of Defendants' "Key Success Factor[s]" identified by Bookbinder was that the "Radiation therapy practice in the community [*i.e.*, Plaintiff] closes."  Yet, in 2013 and 2014, Defendants nevertheless sent their Director of Oncology Practice to Plaintiff's facility for training on all aspects of radiation oncology and continued to request and obtain confidential information from Plaintiff.  (R.R. at 799a.)

Despite this profusion of evidence, which directly contradicted Defendants' position that joining forces with Plaintiff was "never on the table," the trial court granted Defendants' motion for summary judgment on January 30, 2020, holding that Plaintiff failed to present a *prima facie* case for any of its causes of action to overcome a motion for summary judgment.

## Standard on Summary Judgment

> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [its] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.

*Glaab v. Honeywell International, Inc*., 56 A.3d 693, 696 (Pa. Super. 2012).

When considering a motion for summary judgment, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment "where the right to such judgment is clear and free from all doubt." *Toy v. Metropolitan Life Insurance Co*., 928 A.2d 186, 195 (Pa. 2007).

Moreover, it has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those

conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury. *Miller v. Brass Rail Tavern, Inc.*, 664 A.2d 525, 528 (Pa. 1995); *In re Estate of Hunter*, 205 A.2d 97, 102 (Pa. 1964) ("The credibility of witnesses, professional or lay, and the weight to be given to their testimony is strictly within the proper province of the trier of fact.").

At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. *Toy*, 928 A.2d at 195. This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial court cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial court must defer to those conclusions, and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact. *Miller*, 664 A.2d at 528.

## Breach of Fiduciary Duty

*Did Plaintiff come Forward with Evidence that the Parties had Reached an Agreement that they were Joining Forces to Create the New Cancer Center?*

In dismissing the breach of fiduciary duty counts, the trial court "found" there was no fiduciary duty between the parties because no partnership or joint venture was ever created. According to the trial court:

> In this case, **the Court finds there was no fiduciary duty between the parties**. First, **neither a partnership nor a joint venture was ever created**. There is no evidence profits were ever shared or that Plaintiff had any "right of mutual control," which is fundamental to the creation of

both relationships. Second, there is no evidence of any transactions, contracts, or repeated business transactions.

(Trial ct. op. at 14) (emphasis added).

The trial court also "found" that the parties never discussed forming a joint venture:

> **While** [Plaintiff] gave Defendants a QA summary and provided training for GSH because **Dr. Unal believed the two would be working together, there is no indication that was ever the intent of GSH.** Bookbinder did meet with Dr. Unal confidentially, as she did with multiple physicians in the area, **but both her notes and her testimony indicate there was never any talk of hiring Dr. Unal or collaborating with [Plaintiff] to create a joint cancer center**. . . .
>
> Additionally, **as Bookbinder indicated**, the . . . goal of discussing with [Plaintiff] the potential for co-locating **appear[s] to be** just that - a goal. There is no evidence presented that GSH acted on that goal or created an actual plan to join forces with LVCC. The letter sent on behalf of Dr. Unal in June of 2014 **also supports** this lack of an agreement. The letter indicates interest in collaborating and exploring the possibility of the parties working together, **further undermining Plaintiff's belief** a deal had already been struck with Defendants. In addition, the advertisements published by Plaintiff against GSH **support the conclusions that** not only was there no contract between the parties, but that Plaintiff was well aware they would not be working together in the future.

*Id*. (emphasis added).

I submit this was error. Plaintiff sufficiently pleaded facts that the parties met to discuss the possibility of joining forces to create a new cancer center and that the discussions evolved to the point where the parties had reached an agreement – which is evidenced by Plaintiff's transfer of its confidential and

proprietary information to Defendants, which Plaintiff was misled into believing was necessary to jointly create the new cancer center. As noted above, the testimony of Susan McCoy, Dr. Colkitt, and Dr. Castro, together with documents generated by Defendants and their agents, created a disputed issue of fact. It is for the jury to decide whether Defendants met with Plaintiff to discuss the joint formation of a new cancer center, whether the discussions evolved to the point where an agreement was reached, as evidenced by the fact that the parties began to share each other's information for the purpose of creating the center.

The trial court, however, completely disregarded Plaintiff's evidence and actually *resolved* the issue of whether such an agreement was reached by weighing the evidence and crediting the testimony of Defendants' lead witness Nancy Bookbinder, who denied in her deposition that she discussed unifying efforts with Dr. Unal. Bookbinder's credibility, however, was directly at issue and can only be tested by the jury. *In re Estate of Hunter*, 205 A.2d at 102. By concluding that the parties had *not* reached an agreement to join forces to create a new cancer center, the trial court invaded the province of the jury, and in so doing violated the standard for deciding a motion for summary judgment. "It was for the jury to determine whether or not the facts that [it] found, before and during the joint venture, gave rise to a fiduciary duty." *Thompson v. Monetary Mgmt. Corp.*, 44 Pa. D. & C. 4th 401, 408, *aff'd*, 769 A.2d 1218 (Pa. Super. 2000); 13 Summary of Pa. Jurisprudence 2d, Joint Ventures §19:24.

Further, with respect to the Majority's view that Plaintiff cannot establish that Defendants owed any duty to it without introducing out-of-court hearsay statements of Dr. Unal, I respectfully disagree. Complainants often build their *prima facie* cases upon inferences and circumstantial evidence. *See S.N.T.*

*Industries, Inc. v. Geanopulos*, 525 A.2d 736 (Pa. Super. 1987) (evidence which was predominately circumstantial was sufficient to sustain finding that directors and their family conspired to breach and did breach fiduciary duties owed to corporation by seizing corporate opportunity for themselves).

### *Did Plaintiff Come Forward with Evidence that Defendants Breached their Obligations of Loyalty, Fairness, Good Faith and Full Disclosure?*

If a jury concludes that the parties reached an agreement to join forces to create a new cancer center, then the jury could also find that Defendants failed in their duty of loyalty, of fairness, of good faith, or of full disclosure. The Pennsylvania Supreme Court in the matter of *McRoberts v. Phelps*, 138 A.2d 439 (Pa. 1958), held:

> The relationship between those in a joint venture is fiduciary in nature; upon each co-adventurer are imposed obligations of **loyalty, fairness, good faith and full disclosure** toward his fellow co-adventurers. Particularly is this true in the case of that co-adventurer to whom is [e]ntrusted the conduct of the enterprise, toward his associates he occupies the position of a trustee.

*Id*. at 445 (citations omitted) (emphasis added).

The parties dispute whether Plaintiff's confidential information was provided to Defendants and whether Defendants used it to create a competing radiation oncology center across the street from Plaintiff and to steal Plaintiff's patients. On the one hand, Defendants deny that they obtained any confidential information from Plaintiff under false pretenses and they also deny using this information to harm Plaintiff's financial/business interests. As noted, Plaintiff's witnesses testified unequivocally that Plaintiff turned over its confidential and proprietary information to Defendants to aid in the joint development of the new

cancer center, that Defendants later used that information to make sure Plaintiff went out of business, and even went so far as to tell Plaintiff's existing patients that Plaintiff was "closing" and that they should transfer treatment to Defendants' new center.

Despite this contravening evidence brought forward by Plaintiff, the trial court "found" that "there is no indication [Defendants] moved against [Plaintiff] or purposely tried to use any information obtained to undermine [Plaintiff.]" (Trial ct. op. at 15.) Contrary to the trial court's conclusion, there was ample evidence presented by Plaintiff in opposition to summary judgment upon which a jury could find that Defendants sought Plaintiff's confidential and proprietary information and used it to form a new cancer center, which directly competed with Plaintiff, and which arguably was the reason Plaintiff closed its doors in August of 2016.

The disputed factual issue of whether Defendants obtained Plaintiff's proprietary information based on the false premise of working together to jointly develop a cancer center was a question for the jury. The trial court, however, resolved that factual issue against Plaintiff by crediting Defendants' version of events. The trial court was simply not permitted to accept Defendants' position when Plaintiff's evidence created a disputed issue of fact. *Krolczyk v. Goddard Systems, Inc.*, 164 A.3d 521, 530 (Pa. Super. 2017). Whether the breach of fiduciary duty caused damage and if so, how much, was another question which should be left to the jury.

### Violation of Uniform Trade Secrets Act

Next, contrary to the conclusion of the trial court, I believe Plaintiff has a viable claim under the Uniform Trade Secrets Act (Act).[3]

---

[3] 12 Pa.C.S. §§5301-5308.

The Act allows a court to issue injunctive relief, based on threatened or actual misappropriation of a trade secret. 12 Pa.C.S. §5303. In order to state a claim under the Act, the disputed information must first qualify as a trade secret. *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 706 (Pa. Super. 2005). A trade secret is defined as information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. 12 Pa.C.S. §5302. No bright line rule exists on what constitutes a trade secret; rather, the issue is analyzed on a case-by-case basis. *Pestco*, 880 A.2d at 706. Several factors are relevant to the analysis including: (1) the extent to which the information is known outside of the company's business; (2) the extent to which it is known by employees and persons inside the company; (3) the extent of measures the employer has taken to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Crum v. Bridgestone/Firestone North American Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. 2006). The crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner. *D.D. Anderson, Inc. v. Cricki*, 815 A.2d 1063, 1070 (Pa. Super. 2003). Here, the trial court found:

> In this case, **there is no evidence Defendants violated the Uniform Trade Secrets Act**. First, the notes taken by [Defendants] from the meeting at [Plaintiff] with McCoy

PAM - 14

**are insufficient to constitute a trade secret**. From the short period of time spent at [Plaintiff] and the minimal amount of notes taken, it does not appear that Smith obtained any secret information. In addition, **Plaintiff is unable to articulate any specific trade secret that [Defendants] might have obtained or used that was of competitive value to Plaintiff**.

Second, **the eight-page 2014 Quality Assurance summary given to Defendants by McCoy and Dr. Castro cannot be considered a trade secret**. The summary provides a small look into [Plaintiff]. While this information is potentially helpful to either Plaintiff or Defendants, **it does not amount to the level of valuable, secret information that is of great importance to [Plaintiff]**. In addition, **Plaintiff readily gave the information to Defendants and it does not appear that any "improper means" were used to obtain the summary**. As stated above, **there is no evidence Defendants ever actively moved to create a joint cancer center with Plaintiff**. **As such, Plaintiff's incorrect assumption or belief that [it] would be working together with Defendants and thereby giving Defendants the summary would not establish improper means on Defendants' part**.

(Trial ct. op at 17) (emphasis added).

In dismissing this claim, the trial court did not view the facts in the light most favorable to Plaintiff, and, instead, accepted the version of the facts proffered by Defendants, that no trade secrets were exchanged or misused, and that Plaintiff simply voluntarily gave this information to Defendants based on its "incorrect" belief that it was to be used as a part of a joint effort in developing the new cancer center. I submit this was an abuse of discretion.

First, the trial court only addressed "the notes taken by [Defendants] from the meeting at [Plaintiff] with McCoy" and the "2014 Quality Assurance

Summary" and conclusively resolved that information did not constitute trade secrets. However, Plaintiff's fact witnesses and expert witness described *other* confidential and proprietary information, not addressed by the trial court, including, *inter alia*, patient demographics, referral services information, where the patients come from, insurance payors reimbursements, how Plaintiff created patient charts, the types of radiation oncology treatments Plaintiff provided, the numbers of radiation oncology treatments Plaintiff provides, current insurance practices for radiation oncology, reimbursement from local providers, how Plaintiff made masks for head and neck patients, how the treatment planning software worked, how Plaintiff performed Quality Assurance, how Plaintiff staffed the center, how Plaintiff contracted with service providers on its machines, repair costs, bundling for insurance reimbursement processes, and how Plaintiff marketed to the local population. Susan McCoy testified that most of what Plaintiff revealed to Defendants could not be gleaned from documents and could not be reconstructed without personal knowledge of Plaintiff or Dr. Unal. (Affidavit of Susan McCoy; R.R. at 1464a-68a; Deposition of Susan McCoy, R.R. at 1146a-80a.) Dr. Castro also testified unequivocally that the QA program he and Plaintiff had developed was "highly valuable" to the radiation oncology practice. (Affidavit of Paul M. Castro, Ph.D., R.R. at 1585a-87a; Deposition of Paul M. Castro, Ph.D., R.R. at 1183a-94a, 1633a.) Plaintiff's expert, Elinsky, opined that Plaintiff provided Defendants with "sensitive competitive and highly confidential financial and operational information, knowhow developed by Plaintiff over many years," and that the information Plaintiff provided to Defendants was "highly valuable to a competitor entering into the market and was the kind of information commonly considered to be proprietary to a

business." (R.R. at 220a-23a.) Because the trial court disregarded this other information, I believe its analysis was flawed.

Second, it is for the jury to determine the weight and credibility of the testimony and thus decide if the alleged trade secrets deserve protection. *See West Mountain Poultry Co. v. Gress*, 345 A.2d 651, 653 (Pa. Super. 1982) (holding that whether alleged trade secrets deserve protection is a question of fact for the jury). The issue of whether willful and malicious conduct has been involved is also a question of fact for the jury to decide. *Pestco*, 880 A.2d at 709. Therefore, I would reverse the grant of summary judgment on the claim asserting a violation of the Act.

### Misrepresentation

The elements of a negligent misrepresentation claim include: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999).

The elements of intentional misrepresentation are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Id.* at 560.

> The trial court found that **there is no evidence that any misrepresentations, let alone any fraudulent utterances, were ever made in this case**. **There are no statements made to Plaintiff or admissions by Defendants that would support a viable claim.** Ultimately, **the only evidence Plaintiff relies on**

**are actions of [Plaintiff's] employees based on the belief Dr. Unal had that a deal with GSH had been made**. However, Plaintiff's reliance on that belief without sufficient evidence supporting an agreement or intent to form a partnership are insufficient to establish either intentional or negligent misrepresentation. **Plaintiff cannot cite to any other statements, documents, or claims made by Defendants that would qualify as a misrepresentation**.

(Trial ct. op. at 21) (emphasis added).

I believe there is a genuine issue of disputed material fact as to whether Defendants intentionally or negligently misrepresented to Plaintiff that they intended to include Plaintiff in the new cancer center, as a pretext for convincing Plaintiff to train Defendants' employee and disclose its confidential and proprietary information to Defendants.

The intent to defraud may be established by circumstantial evidence, that is, by inferences that reasonably may be drawn from the facts and circumstances. *Integrated Behavioral Health Services v. Department of Public Welfare*, 871 A.2d 296, 300 (Pa. Cmwlth. 2005). *See also D'Emilio v. Board of Supervisors of Bensalem*, 628 A.2d 1230 (Pa. Cmwlth. 1993) (holding that circumstantial evidence was adequate to support finding that developer obtained signatures of board of supervisors on unapproved development plan by fraud, where trial court found that developer substituted unapproved plan for approved plan and led the supervisors to believe that they were signing the approved plan when in actuality they were signing the unapproved plan); *Glover v. Severino*, 946 A.2d 710, 713 (Pa. Super. 2008) ("A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure."). Here, even though Dr. Unal is unavailable for trial and cannot testify

as to the direct representations made to him, Plaintiff came forward with evidence which, if believed by the jury, could establish that the parties reached an agreement to join forces to create a new cancer center, that Defendants never intended to include Plaintiff in the new cancer center, and that Plaintiff was misled into believing the confidential and proprietary information it was sharing with Defendants was for the new cancer center. As factual support for its averments that the parties' reached an agreement to work together to create the radiation oncology department of the new cancer center, Plaintiff proffered evidence that it provided sensitive competitive and highly confidential financial and operational information to Defendants, trained Defendants' key personnel on the grounds that the parties reached an agreement to be working together in the future, and that there was no other reason for Plaintiff to provide this information to Defendants. An inference may reasonably be drawn from those facts that Defendants and Plaintiff were at some point working together to create the new cancer center, that Plaintiff provided Defendants with confidential information and that subsequently, unbeknownst to Plaintiff, Defendants used that information to create the radiation oncology department which did not include Plaintiff, and to redirect Plaintiff's patients to the new cancer center. Thus, unlike the Majority, I do not agree that Plaintiff's action fails outright simply because Dr. Unal died before trial.

It is for the jury to decide whether Defendants misled Plaintiff into believing the parties were joining forces to create the new cancer center (during which Plaintiff provided Defendants with its confidential information in furtherance thereof), or if Plaintiff simply decided to train Defendants' employee on the nuts and bolts of its operation and turn over its confidential information to a potential competitor for no good reason.

### Interference with Contractual Relations

The same goes for the interference with contractual relations claims. The elements for a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987).

The trial court acknowledged in its opinion that there was a dispute between the parties as to whether Defendants intentionally and wrongly diverted patients away from Plaintiff:

> Within the Complaint, Plaintiff provides a detailed list of patients who [it argues] were wrongly diverted away from treatment with [Plaintiff] by GSH. The dates of diversion range from September of 2015 to April of 2016. GSH denies any patients were told Plaintiff was closing or that [it] stopped referring to [Plaintiff] before GSH's cancer center opened.

(Trial ct. op. at 6-7.)

The trial court concluded, however, that "there is no evidence indicating Defendants acted to interfere with Plaintiff's patients." (Trial ct. op. at 22.) Citing Plaintiff's answers to interrogatories, the trial court concluded that Plaintiff failed to articulate "who" specifically interfered with patients and "how" patients were withheld from Plaintiff. *Id.* at 22-23. The trial court also concluded

**Plaintiff does not state any purposeful action or statements made by Defendants to interfere with any**

**patients**.  Without any evidence of direct steps taken by Defendants, there is no indication of why the patients left [Plaintiff].

*Id*. at 23 (emphasis added).

However, this conclusion completely discounts the testimony of Susan McCoy, who testified that when the new center opened in January 2016, Plaintiff's existing patients were told that Plaintiff was "closing" and that they should transfer treatment to Defendants' new center, that she had multiple conversations with Plaintiff's patients who advised her that they were told by Defendants that Plaintiff was closing its radiation oncology center, that they needed to transfer their treatments to Defendants in the middle of receiving their six to eight weeks of radiation treatment, and that Roseanne O., Michael S., Bonnie U., and Judith H., all stopped treating mid-stream at Plaintiff to treat at Defendants' new center. (Affidavit of Susan McCoy; R.R. at 1464a-68a; Deposition of Susan McCoy, R.R. at 1146a-80a.)  Susan McCoy's testimony alone serves as sufficient basis to allow this claim to go forward.  *See also S.N.T. Industries* (evidence which was predominately circumstantial was sufficient to establish a cause of action for intentional interference with prospective contractual relations).

Therefore, I would reverse the trial court with respect to its entry of summary judgment on Counts VII and VIII (contractual and prospective contractual relations).

**Michael Elinsky Expert Report**

Lastly, I believe the trial court erred in excluding from consideration Plaintiff's expert report.  The trial court excluded the Elinsky report because

> [w]ithout any direct statements, concrete evidence, or documents demonstrating either an agreement had been reached or a confidential relationship had been

established, the conclusions in the report are speculative at best. Ultimately, the report reviewed small amounts of testimony and very few documents but still makes broad statements and conclusions without citing specific evidence. This conclusion is therefore not well founded and would be prejudicial to a potential jury.

(Trial ct. op. at 25-26.)

First, the credibility of experts is reserved for a jury and summary judgments entered where experts were disregarded have been reversed. "It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury." *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1162 (Pa. 2010). *See also DeArmitt v. New York Life Insurance Co.*, 73 A.3d 587, 595 (Pa. Super. 2013) (holding that at summary judgment the court must consider "all expert testimony and reports submitted by the non-moving party or provided during discovery" and noting that any dispute over the expert's conclusions must be left to the trier of fact"); *Wright v. Eastman*, 63 A.3d 281, 294 (Pa. Super. 2013); *Greely v. West Penn Power Co.*, 156 A.3d 276, 283 (Pa. Super. 2017).

Second, the four witness depositions that Elinsky evaluated included: the depositions of Nancy Bookbinder, Dr. Colkitt, Susan McCoy, and Dr. Castro. These 4 witnesses had the most knowledge relevant to the events which gave rise to Plaintiff's complaint and they formed the very basis for Elinsky's opinions. The trial court's focus on the fact that Elinsky only reviewed 4 depositions out of 20 seems to me to be putting quantity over quality and I do not believe it constituted a valid reason to discount his expert opinion.

## Conclusion

In sum, I do not agree with the Majority that the issues were "thoroughly reviewed" or "correctly analyzed" by the trial court. As I have demonstrated herein, the trial court improperly relied on Defendants' one-sided version of events and failed to view the evidence in a light favorable to Plaintiff. The trial court repeatedly disregarded record evidence, made credibility determinations, and barely mentioned the testimony of Plaintiff's witnesses, Dr. Colkitt, Dr. Castro, or Susan McCoy. In so doing, I submit that the trial court erred in concluding that Plaintiff failed to present a *prima facie* case for any of its causes of action to overcome a motion for summary judgment.

For these reasons, I dissent.

_____
PATRICIA A. McCULLOUGH, Judge